# Illinois Official Reports

## Appellate Court

---

**People v. Schreiner, 2021 IL App (1st) 190191**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PAUL SCHREINER, Defendant-Appellant. |
| District & No. | First District, Third Division<br>No. 1-19-0191 |
| Filed | April 21, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 17-CR-40274; the Hon. Roman Ocasio III, Judge, presiding. |
| Judgment | Vacated and remanded with directions. |
| Counsel on Appeal | Alexander Michael, of Michael D. Ettinger and Associates, of Palos Heights, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Christine Cook, Assistant State's Attorneys, of counsel, and Armando Mendia Jr., law school graduate), for the People. |
| Panel | JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Presiding Justice Howse and Justice McBride concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a stipulated bench trial, defendant Paul Schreiner was found guilty of aggravated driving under the influence of alcohol and sentenced to four years' imprisonment. Before trial, defendant moved to suppress all evidence obtained within his home, as the police conducted a warrantless search. Defendant sought to exclude incriminating statements made by his wife and by defendant at home and following his arrest, results of sobriety and blood-alcohol tests conducted at his home and at the police station postarrest, and evidence of the damaged vehicle inside his locked garage. The trial court denied the motion, agreeing with the State that defendant's wife voluntarily consented to the entry of the police officers, thus satisfying the fourth amendment.

¶ 2        We hold that the State failed to carry its burden of proving voluntary consent and, in fact, failed to offer any proof whatsoever of voluntary consent. The warrantless entry constituted an unreasonable search under the fourth amendment. We thus vacate defendant's conviction and remand this cause for further proceedings consistent with our directions.

¶ 3                                                    BACKGROUND

¶ 4        The State charged defendant by information with aggravated driving under the influence (DUI). See 625 ILCS 5/11-501(a)(1), (d)(1)(A), (d)(2)(D) (West 2016). Before trial, defendant moved to suppress "all evidence acquired as a result of an unlawful entry onto [defendant's] property and an unlawful entry into [defendant's] residence which resulted in an unlawful arrest of the [defendant] and the acquisition of evidence thereafter." That evidence included statements made at his home to police, sobriety and blood-alcohol tests conducted on defendant within his home, and evidence of his damaged automobile in his garage.

¶ 5        The trial court held a hearing on defendant's motion. For context, we provide some basic facts before diving into the specifics of the testimony: On October 19, 2017, a few minutes past 11 p.m., defendant's car crashed into a parked car near the intersection of Grand Avenue and Oak Street in Franklin Park, Illinois. Defendant left the scene of the collision and drove home, only a block or two away. Police officers from Franklin Park and River Grove responded to the report of a hit-and-run and obtained information on the general direction of the fleeing car. Within minutes, the officers were able to follow a trail of fluids, pieces of the car, and scrape marks all the way to the garage of defendant's home.

¶ 6        With that, we take up the testimony of the witnesses called by the defense at the suppression hearing. There were two—defendant's wife, Julie Schreiner, and defendant himself.

¶ 7        Mrs. Schreiner testified that she and defendant lived on North Elm Street in River Grove. On the evening of October 19, 2017, she was in her bedroom sleeping. Defendant was also home and was sleeping in "the back bedroom." Around 11:10 p.m., Mrs. Schreiner was startled awake by the doorbell, which she testified began ringing "at minimum three times." She also saw a light flash into the house, which caused her to "jump up." She then heard "at least a minimum of three banging poundings on [her] door." Mrs. Schreiner put on a robe, turned on the light, and went to the front door.

¶ 8        When Mrs. Schreiner got to the front door, she looked through the blinds next to the door and saw three police officers on the front porch. One officer had the glass storm door open, and the other two officers were behind him. Even though no one had said anything yet, Mrs.

Schreiner opened the front door. Mrs. Schreiner explained that she opened the door unprompted because she saw three police officers and she was "afraid that they were going to break the door down." She did not believe she had any choice but to open the door.

¶ 9 When Mrs. Schreiner opened the door, one of the officers asked her if she owned a blue Mazda. The officer explained that a blue Mazda had been involved in an accident and there was a trail of liquid led from the scene of the accident to her garage door. The officer further indicated that the police needed access to the garage.

¶ 10 A different officer then asked Mrs. Schreiner if she knew anything about the accident. She told the officers that *she* was involved in the accident and left the scene because she "panicked." The officer told Mrs. Schreiner to get her driver's license. So she went to her bedroom to retrieve her license. When she returned with it, the officers were standing inside her house. She testified that she was never shown a warrant (that much is undisputed), nor did the officers ever ask for her consent to enter her home or her garage:

> "Q. Did any officer ask your permission or consent prior to entering to enter the house—
>
> A. No.
>
> Q. —your house?
>
> A. No.
>
> \*\*\*
>
> Q. Did you consent to them going into your garage?
>
> A. No.
>
> Q. Did Paul Schreiner, your husband, consent in your presence—
>
> A. No.
>
> Q. —to them going in your garage?
>
> A. No."

¶ 11 At that point, when Mrs. Schreiner had returned to the front door with her driver's license and found the officers inside her home, one of the officers asked her, "Were you really driving the car?" Mrs. Schreiner began crying. She admitted that she lied and stated that her husband, defendant, had been driving the blue Mazda.

¶ 12 Mrs. Schreiner then went to get dressed. When she returned to the front room, one of the officers asked her if there was anybody else in the house. Mrs. Schreiner said that defendant was in the back bedroom. An officer instructed her to get defendant and then followed her, first to the back room and then to the bedroom. The officer told defendant to "get up and get dressed." After defendant put clothes on, the officer led Mrs. Schreiner and defendant back to the front room.

¶ 13 At that point, a different officer gave Mrs. Schreiner a piece of paper and told her that defendant "had to fill [it] out for insurance or whatever." The officers then said that they needed to get into the garage and asked if it was locked. Mrs. Schreiner said that the garage was locked, and an officer instructed her to "go get the keys." After Mrs. Schreiner returned with keys, one of the officers walked outside with her and defendant to the backyard, where the garage was located. The officer then told Mrs. Schreiner to open the garage door. Another officer directed defendant to leave the garage and go into the alley. Defendant was eventually arrested for DUI.

¶ 14    Mrs. Schreiner stated that none of the officers presented a search warrant or requested her permission to enter the home. Nor did the police present a warrant authorizing a search of the garage. Mrs. Schreiner said that neither she nor defendant ever gave the police consent to enter the garage.

¶ 15    Defendant testified that on the evening of October 19, 2017, he was sleeping in the back bedroom of his house. At approximately 11:15 p.m., defendant was awakened by Mrs. Schreiner, who was accompanied by a police officer. The officer told defendant to get dressed and then escorted defendant and Mrs. Schreiner to the living room. Once there, the officer said he needed to "go to the garage" and told Mrs. Schreiner to get her keys for the garage. Mrs. Schreiner got the keys, and they walked to the garage. The officer directed Mrs. Schreiner to open the side door to the garage, which she did, and then they went in the garage and opened the overhead door. Defendant stated that there were "three squad cars on this side and three squad cars on this side with all their lights flashing." Defendant was never shown an arrest or search warrant. After entering the garage the police took defendant to an alley and administered a field sobriety test. Defendant was then arrested.

¶ 16    On cross-examination, defendant testified he arrived home around 10 p.m., and Mrs. Schreiner was awake at the time. Before going to bed, defendant spoke with his wife and told her he had been in an accident and left the scene. He did not tell Mrs. Schreiner to tell the police she was driving if the police showed up. When confronted by the fact the police had received a call relating to the accident at 11:12 p.m., defendant admitted he could have struck the vehicle closer to 11 p.m.

¶ 17    Defendant did not know what time the police arrived at his house. He had no knowledge of the conversation between Mrs. Schreiner and the police prior to being awakened. He did not believe Mrs. Schreiner came into the room at any time prior to when he was awakened by her. Despite the fact that Mrs. Schreiner was scared and startled by the police knocking on her door, she did not come to wake him up before answering the door.

¶ 18    While speaking with police by his garage, defendant admitted he had been driving a blue Mazda, was involved in a car accident, and had been drinking alcohol. He originally told officers he had drunk three beers. He did not recall that a preliminary breath test revealed his blood alcohol content (BAC) was 0.218.

¶ 19    The defense rested, and the State called two witnesses.

¶ 20    Franklin Park police Sergeant Michael Jones testified that on the evening of October 19, 2017, he received a dispatch at 11:12 p.m. stating that a blue vehicle had struck a parked car at Grand Avenue and Oak Street in River Grove, Illinois, and was fleeing southbound on Oak Street. Sergeant Jones responded to the scene and observed debris, including a headlight, "all over the street." Sergeant Jones "started to follow *** pieces of the vehicle, fluids from the vehicle, and some sort of scrape mark of something coming off the vehicle that was leaving a trail southbound on Oak Street from the accident scene." As Sergeant Jones followed the trail, he heard over the radio that other officers had already followed the trail of debris to a home at 2434 Elm Street in River Grove.

¶ 21    When Sergeant Jones arrived, Franklin Park police officer Iagulli, Franklin Park tactical officer Velazquez, and River Grove police officer Conway (no first names in the record) were already on site. Sergeant Jones walked to the front of defendant's home. Officers Iagulli and Velazquez then approached the front door and knocked; Sergeant Jones stood back on the sidewalk, approximately 40 to 50 feet from the door.

¶ 22    The entrance to the Schreiner home had a screen door and a main door. Julie Schreiner "answered the door" and, while holding a "glass screen door" open, "put her hands in the air and said, I'm sorry. I was the one driving. I did it." Sergeant Jones stated that Mrs. Schreiner then became "weepy." Sergeant Jones testified that, prior to Mrs. Schreiner making those statements, he did not hear any conversation between Mrs. Schreiner and Officers Iagulli and Velazquez. Sergeant Jones stated that Mrs. Schreiner held the storm door open the entire time she spoke with Officers Iagulli and Velazquez.

¶ 23    According to Sergeant Jones, Officer Velazquez walked over to him and stated that Mrs. Schreiner had admitted to driving the car. In response, Sergeant Jones told Officer Velazquez there was "no way she got in the car accident." Sergeant Jones then walked toward the house. At that point, Mrs. Schreiner and Officer Iagulli were inside. Sergeant Jones explained, "I just saw Officer Iagulli and Mrs. Schreiner enter the house." Mrs. Schreiner did not close the door before Iagulli walked in; rather, the main door stayed open "the whole time from the time she opened it." Jones never heard Mrs. Schreiner tell the officers to get or stay out of the house. Neither Iagulli nor Velazquez raised their voice to get into the house, and neither drew a weapon.

¶ 24    Sergeant Jones approached the open storm door, stepped inside, and asked Mrs. Schreiner who else was in the house. Mrs. Schreiner told him defendant was inside. Sergeant Jones then told Mrs. Schreiner, "You and I both know you weren't driving the car." According to Sergeant Jones, Mrs. Schreiner "broke down crying," "threw her hands in the air," and "started screaming, I'm sick of this s***." Mrs. Schreiner also told Sergeant Jones that she "didn't want to get [defendant] in trouble."

¶ 25    Thereafter, Sergeant Jones asked Mrs. Schreiner to get defendant from the bedroom. She walked to the bedroom. A minute later, she returned and told Sergeant Jones that she could not wake up defendant. In response, Sergeant Jones asked Mrs. Schreiner if he could try to wake up defendant. She said yes, so Sergeant Jones walked to the bedroom and, while standing in the doorway, called out to defendant. After Sergeant Jones called out a second time, defendant opened his eyes. Defendant's cheeks were flushed red, and he had a cut on his cheek. Sergeant Jones asked defendant if he had been in an accident. Defendant responded "yeah." Sergeant Jones then asked defendant if he needed an ambulance. Defendant said he was "fine."

¶ 26    Sergeant Jones then asked defendant if the officers could see the car. Defendant and Mrs. Schreiner then led the officers out of the house to the garage. Mrs. Schreiner unlocked the garage. Defendant and Mrs. Schreiner then stepped inside, and Sergeant Jones followed. Once inside the garage, Sergeant Jones asked defendant for his insurance card. After searching for the card in the car, Sergeant Jones asked defendant if the card was in his wallet, which he was holding. It was. Sergeant Jones testified that, when he was speaking to defendant in the garage, he could smell alcohol on defendant's breath. In addition, Sergeant Jones could see damage on the vehicle in the garage. Thereafter, defendant submitted to field sobriety tests, a preliminary breath test, and a Breathalyzer.

¶ 27    Afterwards, the officers arrested defendant. Sergeant Jones explained that the officers' decision to arrest defendant was based on (1) the fact there was a trail of debris, fluid, and scrape marks leading from the scene of the hit-and-run accident to defendant's garage; (2) defendant's slurred speech; (3) defendant's difficulty getting dressed; (4) defendant's difficulty locating his insurance card until Sergeant Jones prompted defendant to look in his wallet, which he was holding in his hand the entire time he was looking; (5) defendant's

inability to perform the field sobriety tests satisfactorily; and (6) the preliminary breath test, which revealed a BAC in excess of the legal limit.

¶ 28 Finally, Franklin Park police officer Vega (no first name in the record) testified that he administered the field sobriety tests to defendant in the alley behind defendant's garage. Defendant failed the tests. In addition, Officer Vega administered a preliminary breath test, which revealed defendant's BAC exceeded the legal limit. According to Officer Vega, defendant admitted that he was involved in a car accident near Grand Avenue and Maple Street. Defendant told Officer Vega that, before the accident, he consumed two tall glasses of beer prior to the accident. Defendant denied drinking alcohol after the accident.

¶ 29 The State introduced a certified copy of defendant's DUI conviction in case No. 12 C4 40335 for the purpose of impeaching his credibility, which the trial court admitted over defendant's objection. The State then rested.

¶ 30 In closing argument, defendant argued that the State conducted a warrantless entry into defendant's home and did not show either exigent circumstances or voluntary consent by the homeowner to enter the dwelling. The defense stated that though there was no proof of consent, any possible consent Mrs. Schreiner may have given would have been due to the stress caused by the overbearing nature of the police conduct. The State acknowledged the warrantless entry but argued that the police "can enter someone's house if there is consent, which is what we have in this case."

¶ 31 The circuit court denied defendant's motion. The court summarized the officers' response to the hit-and-run occurrence and how the officers followed a trail of debris, fluids, and scrape marks to defendant's garage. The court then stated:

> "They knock on the door so they can further investigate what's happening. The officer testified that initially [Mrs. Schreiner] tells them—she testified that she was so afraid that I didn't believe I had a choice about whether or not I should let the officers in.
>
> I believe the reason she was afraid is because she had just learned that her husband was under the influence, had been involved in an accident, and was trying to avoid any responsibility for the actions he took. I believe he communicated those actions to [Mrs. Schreiner] and basically went to the room to sleep.
>
> The wife was in distress, as any—I believe any wife would be. I think that she wanted to protect her husband. She was under stress, whether [defendant] contributed to her [*sic*] wife's stress purposely by giving her directions, I do not know. I am not positive. But I believe that she wanted to be a good person and wanted to protect [defendant], but I believe she also wanted to comply with law enforcement officers.
>
> And I believe that she did acquiesce in, did consent of letting the officers in. Eventually, when confronted by—with follow-up questions, she did make an admission that [she] was not involved in the accident; that she believed [defendant] was involved; and, in fact, I believe that she actually knew because [defendant] said she [*sic*] told Julie *** that he was involved in an accident."

¶ 32 Defendant filed a motion to reconsider the denial, which the trial court denied. The matter proceeded to a stipulated bench trial, at the conclusion of which the court found defendant guilty of aggravated DUI and sentenced him to four years' imprisonment. This appeal

followed.

¶ 33 ANALYSIS

¶ 34 I

¶ 35     On appeal, defendant claims the trial court erred by denying his motion to suppress evidence. On review of a suppression ruling, we conduct a two-step process. First, we defer to the trial court's factual findings and will reverse them only if they are against the manifest weight of the evidence. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). But second, this court on appeal "remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted." *Id.* Thus, "we review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted." *Id.*

¶ 36     When a defendant files a motion to suppress evidence, he bears the burden of making out a *prima facie* case that the evidence obtained was the product of an unreasonable search. *People v. Brooks*, 2017 IL 121413, ¶ 22. If he does so, the burden shifts to the State to present evidence that the search was constitutionally valid. *Id.* The ultimate burden of proof, however, rests with defendant. *Id.*

¶ 37     Here, there can be no question (nor does the State question) that defendant established a *prima facie* case of an unreasonable search. That is, it is undisputed that the police entered defendant's home without a warrant. The Supreme Court has long held, as "a 'basic principle of Fourth Amendment law[,]' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). As has our supreme court. See *People v. Bull*, 185 Ill. 2d 179, 196-97 (1998) ("The fourth amendment prohibits the warrantless search of a person's home as *per se* unreasonable."). Indeed, "the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Welsh*, 466 U.S. at 748 (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)).

¶ 38     With the *prima facie* case easily established, the burden shifted to the State to demonstrate the constitutionality of the search. *Brooks*, 2017 IL 121413, ¶ 22. It can carry that burden by proving the existence of "a few specifically established and well-delineated exceptions to the warrant requirement." *Bull*, 185 Ill. 2d at 197.

¶ 39     One exception is when exigent circumstances (hot pursuit, destruction of evidence, public safety, etc.) demand the officers' warrantless entry. *Payton*, 445 U.S. at 583; *People v. McNeal*, 175 Ill. 2d 335, 345 (1997) (exigent circumstances may justify warrantless search); *People v. Foskey*, 136 Ill. 2d 66, 74 (1990) ("The fourth amendment does not prohibit officers from entering a home without a warrant if exigent or compelling circumstances justify the entry."). But the State has never claimed an exigency, either below or on appeal, nor did the State develop any factual record that an exigency existed. So we put exigent circumstances aside.

¶ 40     That leaves the other exception to the warrant requirement—the homeowner's voluntary consent to the police officers' entry. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) ("a search authorized by consent is wholly valid" even absent warrant); *Katz v. United States*, 389 U.S. 347, 358 n.22 (1967) ("A search to which an individual consents meets Fourth Amendment requirements ***."); *Bull*, 185 Ill. 2d at 197 ("One such exception [to the warrant requirement] is a search conducted pursuant to consent."); *People v. Anthony*, 198 Ill. 2d 194,

202 (2001) ("a search conducted with a defendant's voluntary consent but without a warrant does not violate the fourth amendment").

¶ 41    As with the exigent-circumstances exception, in establishing the consent exception for the warrantless search, "the State bears the burden of proving the consent was truly voluntary." *Anthony*, 198 Ill. 2d at 202; see *Bustamonte*, 412 U.S. at 222 (" '[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given' " (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968))); *People v. Hayes*, 2018 IL App (5th) 140223, ¶ 28.

¶ 42    That is where the battle is joined on appeal—whether the trial court properly found that the State carried its burden of establishing that the officers received voluntary consent from the homeowner to enter defendant's house. We can quickly dispense with the fact that it was defendant's wife, not defendant himself, who allegedly consented to the entry. The consent is valid as long as it is given, if not by the defendant, then by someone who possesses common authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *Bull*, 185 Ill. 2d at 197. Defendant does not deny that Mrs. Schreiner had authority to consent, so we need not consider that further.

¶ 43    The parties spend a fair amount of energy on appeal debating the reasonableness of the police action here. Defendant says the officers were trespassing and that their knock-and-talk was unreasonably coercive, given the lateness of the hour and the fact that they shined flashlights into the home, pounded excessively on the door, asked accusatory questions, and did so with an imposing number of officers present. The State argues that, under the circumstances, the officers' conduct was reasonable in trailing evidence to the house and attempting to locate the driver of the hit-and-run vehicle.

¶ 44    But the question, first and foremost, is not the reasonableness of the officers' warrantless entry but whether they had voluntary consent from the homeowner to enter the home, the only exception to the warrant requirement the State offers here. See, *e.g.*, *Commonwealth v. Rogers*, 827 N.E.2d 669, 677 (Mass. 2005) ("Only if voluntary consent is in fact given can we say that the police were 'reasonable' in entering the home. Absent voluntary consent, we do not rely on our own notions of 'reasonableness' to justify the entry."). The fourth amendment's warrant requirement has two exceptions: exigent circumstances (of which there are many) and voluntary consent. There is no third category for the overall reasonableness of the officers' conduct. Quite the contrary: absent one of those two exceptions, a warrantless search is "*per se* unreasonable." *Bull*, 185 Ill. 2d at 197; see also *Welsh*, 466 U.S. at 749 (" 'searches and seizures inside a home without a warrant are presumptively unreasonable,' " requiring governmental justification based on recognized exception to warrant requirement (quoting *Payton*, 445 U.S. at 586)).

¶ 45    Said differently, a warrantless entry is never reasonable unless it fits within one of the exceptions to the warrant requirement, which by definition would make the entry reasonable. So the critical question is whether the State carried its burden of showing that Mrs. Schreiner consented to the officers' entry into her home.

¶ 46    The clearest and cleanest example of consent, obviously, would be express consent, either verbally or in writing. The officers here did not ask Mrs. Schreiner to sign a consent-to-search form. And there was no testimony from any witness that she verbally consented. That, itself, is worth considering for a moment. There were three people who were part of the encounter at

the front door—two officers who knocked on the door, Officers Iagulli and Velazquez, and then, of course, Mrs. Schreiner.

¶ 47 Mrs. Schreiner specifically denied giving consent to the officers' entry, verbally or otherwise. She testified that, after she falsely admitted her guilt, an officer asked her to retrieve her driver's license and she did so; when she returned to the front door, the officers were standing inside the house. True, the trial court might not have believed her testimony. But even if the trial court discounted her testimony entirely, the State offered nothing to affirmatively show that Mrs. Schreiner *did* expressly consent to the officers' entry.

¶ 48 That is surprising, given that two officers—Iagulli and Velazquez—approached the front door, knocked, and spoke with Mrs. Schreiner when she answered the door. But the State called neither witness at the suppression hearing. Nor, for that matter, and again to our surprise, did the State cross-examine Mrs. Schreiner—not a single question. The State knew that the officers' entry was warrantless and knew it had the burden of proving voluntary consent at the suppression hearing, yet it called neither of the two officers who could testify with personal knowledge to that issue. Nor did the State ask for a continuance to secure their appearance (if for some reason they were unable to attend, as sometimes happens with officers on duty). The State went forward without either of its two governmental participants to the three-person interaction and without asking a single question of the third participant, Mrs. Schreiner.

¶ 49 Only one of the two testifying officers even *saw* the initial interaction at the front door between Iagulli, Velazquez, and Mrs. Schreiner—Sergeant Jones, who testified that he could not hear what was said from his position on the sidewalk, some 40 or 50 feet away. The one exception is that he did hear Mrs. Schreiner (falsely) admit her guilt—presumably those words were spoken more loudly—but nothing else. Nothing, he specifically testified, about whether the officers did or did not have permission to enter the home.

¶ 50 So whatever may have actually occurred, the State offered no proof whatsoever that Mrs. Schreiner expressly consented to the officers' entry into the home.

¶ 51 Still, consent can be nonverbal. *Anthony*, 198 Ill. 2d at 202. We must be cautious, first of all, about confusing consent with mere submission to government authority. While consent to search may be conveyed by "nonverbal conduct," a person's " 'mere acquiescence to apparent authority is not necessarily consent.' " *Id.* at 202-03 (quoting *People v. Kelly*, 76 Ill. App. 3d 80, 87 (1979)); see *Bumper*, 391 U.S. at 548-49 (explaining that government cannot sustain its burden of proving voluntary consent "by showing no more than acquiescence to a claim of lawful authority").

¶ 52 Our supreme court has also cautioned against reading too much into nonverbal cues of a homeowner: "In the case of nonverbal conduct, where dueling inferences so easily arise from a single ambiguous gesture, the defendant's intention to surrender this valuable constitutional right should be *unmistakably clear*." (Emphasis added.) *Anthony*, 198 Ill. 2d at 203.

¶ 53 It is not hard to imagine nonverbal gestures that would be "unmistakably clear" (*id.*) in conveying consent. Opening the door and stepping aside so the person outside may pass inside, for example, typically would tell visitors they are welcome to enter, as would a wave of the hand or a nod of the head. See, *e.g.*, *United States v. Rodriguez*, 931 F. Supp. 907, 918 (D. Mass. 1996) ("An objective manifestation of consent to a warrantless search may include a gesture such as stepping away after opening a door."); *State v. Shurter*, 468 N.W.2d 628, 632 (Neb. 1991) ("When one manifests consent by making an inviting or pointing gesture, such as waving a law enforcement officer into the premises or opening the door wider and stepping

backward, it would be unwise to invalidate such a consent for the reason that the officer failed to engage in the empty formality of first seeking permission to enter.").

¶ 54 This court found voluntary consent when a defendant began a conversation with police as they stood outside his apartment but then the defendant walked away from the still-open front door, moved into his kitchen, and sat down at the table, while he continued to converse with police, nonverbally indicating that the officers were free to enter the house to continue the conversation. *People v. Gross*, 166 Ill. App. 3d 413, 424 (1988). (We should add that a badly wounded individual had been found just outside the apartment building, the police were actively seeking the armed, violent assailant and believed him to be inside that apartment based on eyewitness accounts, and thus we found exigent circumstances, too. See *id.*)

¶ 55 Here, we have precious little testimony about nonverbal gestures indicating the officers were free to enter the dwelling. Mrs. Schreiner did leave the main front door open when she walked away from it, but there remained an outer glass storm door. And she did not walk away from the front door, as in *Gross*, to continue the conversation; she did it because the police asked for her driver's license, and she went to retrieve it in her bedroom. (Recall she was in her pajamas when she answered the door.) And whatever credibility we may or may not place on Mrs. Schreiner's testimony, *that* part was corroborated by Sergeant Jones, who said that, when he walked from the sidewalk up to the house and entered the home, Mrs. Schreiner was handing Iagulli her driver's license.

¶ 56 The State, as noted, did not follow up or challenge Mrs. Schreiner's testimony at all. Its evidence? Sergeant Jones had little in terms of specifics. As noted, he was initially on the sidewalk, watching Iagulli and Velazquez talking with Mrs. Schreiner at the front door, 40 or 50 feet away. Afterward, Velazquez walked toward Jones and told him that Mrs. Schreiner had confessed to the hit-and-run, and Jones expressed to Velazquez his skepticism that she was the driver. At that point, he testified, Iagulli and Mrs. Schreiner were inside the home. The State then asked more pointed questions:

"A. *** I walked up to the sidewalk. Officer Iagulli and Mrs. Schreiner were already in the house, maybe 6 to 8 feet between the two of them.

Q. Did you ever see—when your fellow officers entered the house, can you describe that, how that happened?

A. After she talked about she was the one driving, I'm sorry, I was scared, and started crying or whatever, I just saw Officer Iagulli and her enter the house. ***

Q. Did you see at that point any officers—did you see her close the door and then an officer open the door?

A. No. The main door stayed open the whole time from the time she opened it. It was just a glass screen door. She held it open as she talked to them. And then Officer Iagulli and her walked into the house. And then Officer Velazquez walked away towards me.

Q. At any point, did you see her tell the officers to get out or stay out of the house, anything of that nature?

A. No.

Q. Did you see any of the officers or hear any of the officers raise their voice to get into that house?

A. No.

Q. Any guns drawn?

A. No."

¶ 57    The record does not show that Mrs. Schreiner did anything to indicate that the officers were welcomed into her home. We know that Mrs. Schreiner held the glass storm door open while she *conversed* with the officers. But we do not know how it was that Officer Iagulli then walked in. Did Mrs. Schreiner hold the glass storm door open (or open it wider) for Officer Iagulli, a nonverbal indication that he could enter? Nod her head or gesture in a welcoming way? Did Iagulli catch the screen door and let himself in as she walked away, without first seeking permission to enter? Did Iagulli just presumptively follow Mrs. Schreiner in without asking and without her having indicated her consent in any way? If Mrs. Schreiner did, in fact, tell or nonverbally indicate to Iagulli that he could enter, what had the officers said to her *before* that moment to gain such consent? Did they tell her they had the right to come in or that she had no choice? Were any words to that effect, either way, spoken by either the officers or Mrs. Schreiner? Or did Mrs. Schreiner walk away to retrieve her driver's license on the presumption that she was about to be arrested for a hit-and-run, planning to step outside to meet the officers so they could take her to the station, as opposed to allowing the officers inside (which, after all, would be consistent with her initial plan to keep the police away from her guilty husband)?

¶ 58    No single fact is dispositive, but these are the kinds of questions we ask in determining whether Mrs. Schreiner manifested express consent, nonverbal consent, or mere acquiescence to police authority—and if it was nonverbal consent as opposed to mere acquiescence, whether it was "unmistakably clear" nonverbal consent. *Anthony*, 198 Ill. 2d at 203. And these facts are altogether absent. These questions would have been incredibly easy to answer with the right witnesses. It may well be the case that the officers here followed the letter and the spirit of the law, but the State has the burden of putting that proof on the record. For whatever reason, the State did not call the relevant witnesses with personal knowledge of these facts.

¶ 59    To the extent we know anything at all about this interaction at the door from Officer Jones, it is merely that Mrs. Schreiner held open the screen door while talking to the officers, she never closed the "main" door, and in some fashion or another, Officer Iagulli entered the house. Beyond that, any evidence came from Mrs. Schreiner, who testified that she never consented to the officers' entry and found them inside when she returned from her bedroom with the driver's license. At the risk of repeating ourselves, Mrs. Schreiner's testimony might not be believable, but the State offered nothing in response—nothing whatsoever to satisfy its burden.

¶ 60    The mere fact that Mrs. Schreiner did not close the main door in the officers' face does not mean that she consented to their entry. Indeed, given that she left the area by the front door to retrieve her driver's license and come back—in other words, that her interaction with the visiting officers was obviously not completed—it would have been downright odd for her to shut the main door in their faces. Shutting the door is more likely to signal the end of an encounter than a just-a-moment-I-will-be-right-back situation. It might also be seen as a hostile act by the officers. In any event, not closing the main door in their faces under those circumstances, at best, might be considered an "ambiguous" gesture capable of "dueling inferences" but certainly not an "unmistakably clear" one indicating voluntary consent to enter. *Anthony*, 198 Ill. 2d at 203.

¶ 61    The trial court appeared to not wholly believe Mrs. Schreiner's testimony. If so, that determination would be entitled to our considerable deference. But even if we gave the State all of that—even if we discarded Mrs. Schreiner's testimony entirely, even that which was

- 11 -

corroborated—the State still had the burden of proving voluntary consent, and it did not do so. The fact that a defense witness, who claimed consent was *not* given, is not a credible witness is no substitute for affirmative proof that consent *was* given.

¶ 62 At oral argument, the State argued that, by confessing (albeit falsely) to the crime, Mrs. Schreiner was indicating to the officers her willingness to submit to law enforcement. It is true that Mrs. Schreiner freely confessed and obediently retrieved her driver's license when told to do so. But being cooperative, even confessing guilt, are very different things from allowing entry into the home. The fourth amendment does not contain an exception for people who admit their guilt or are willing to provide information to law enforcement. Absent voluntary consent or exigent circumstances, the police may not breach the entrance of the home without a warrant.

¶ 63 And even if Mrs. Schreiner's would-be confession gave the police probable cause to *arrest* her at that moment (which surely it did, though to their credit they did not), a warrantless arrest, as much as a warrantless search, may not take place inside the individual's home unless accompanied by an exception to the warrant requirement—voluntary consent or exigent circumstances. See *Welsh*, 466 U.S. at 749 ("warrantless felony arrests in the home are prohibited by the Fourth Amendment, absent probable cause and exigent circumstances"); *Payton*, 445 U.S. at 583-90.

¶ 64 The State did not claim any exigent circumstance. It rested its burden of justifying this warrantless search solely on the basis of voluntary consent and then presented no evidence on that point, other than Mrs. Schreiner falsely confessing and not shutting the main door in the faces of the officers while she retrieved her driver's license, and other than the fact that the police did not yell at Mrs. Schreiner or point guns in her face.

¶ 65 The long and short is this: We do not mean to criticize the officers involved in this matter, because they may have acted entirely within legal and constitutional principles. But the State had the burden of making that case and did not. The record supplies no basis to find voluntary consent, and thus the trial court's finding of voluntary consent was manifestly erroneous. There is no basis to uphold the validity of this warrantless entry; it was thus an unreasonable search. So unless the State established a basis for the admissibility of this evidence despite the fact that it was the product of an unreasonable search, the motion to suppress should have been granted.

¶ 66 II

¶ 67 Defendant argues for suppression of all evidence the officers obtained—Mrs. Schreiner's outburst that her husband was guilty; defendant's inculpatory statements inside the bedroom, by the garage, and at the police station; the results of the field-sobriety and blood-alcohol tests; and the evidence of the damaged automobile. He says all evidence obtained was spawned from the illegal entry and thus was "fruit of the poisonous tree" that must be suppressed under the exclusionary rule. See *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

¶ 68 The judicially created remedy of suppression or exclusion is a " 'bitter pill' that is to be used only as a 'last resort.' " *People v. Manzo*, 2018 IL 122761, ¶ 69 (quoting *Davis v. United States*, 564 U.S. 229, 237 (2011)). Yet it remains true that, "to make effective the fundamental constitutional guarantees of sanctity of the home and inviolability of the person," the Supreme Court has long held that "evidence seized during an unlawful search could not constitute proof against the victim of the search." *Wong Sun*, 371 U.S. at 484. In one sense, the exclusionary

rule is broad in that it "extends as well to the indirect as the direct products of such invasions." *Id.*

¶ 69   For example, it may extend to confessions obtained in the home after an unreasonable entry, as it did in *Wong Sun* itself. See *id.* at 487; see also *Oregon v. Elstad*, 470 U.S. 298, 306 (1985) ("The *Wong Sun* doctrine applies as well when the fruit of the Fourth Amendment violation is a confession."). It may extend as well to the discovery of information gleaned from that at-home confession, even if that leads to the discovery of evidence in another location— as also was true in *Wong Sun*, 371 U.S. at 487-88 (heroin found at other individual's home suppressed when police learned of drugs from earlier confession following illegal entry).

¶ 70   Still, the exclusionary rule has its limits. One of them is the attenuation doctrine. That is, when the connection between the illegal entry and the evidence obtained has " 'become so attenuated as to dissipate the taint' " of the initial entry, that evidence will not be suppressed. *Id.* at 491 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). This is the law in Illinois as well: "The relevant inquiry is whether the [evidence] was obtained by exploitation of the illegality of the arrest. [Citation.] Evidence obtained after an illegal entry need not be suppressed if such evidence was obtained ' "by means sufficiently distinguishable to be purged of the primary taint" ' of the illegality." *People v. Foskey*, 136 Ill. 2d at 85 (quoting *People v. White*, 117 Ill. 2d 194, 222 (1987), quoting *Wong Sun*, 371 U.S. at 491). "The burden of showing redeeming attenuation as to evidence obtained through an illegal arrest is on the prosecution." *Foskey*, 136 Ill. 2d at 86; see also *Brown v. Illinois*, 422 U.S. 590, 604 (1975) (burden of showing attenuation "rests, of course, on the prosecution").

¶ 71   Among the various items of evidentiary value obtained by the officers here following their unlawful entry—incriminating statements at defendant's home and at the station, failed sobriety and blood-alcohol tests at home and at the station, evidence of the damaged vehicle involved in the hit-and-run—there might be arguments that sufficient attenuation existed to purge the taint of the unlawful entry and render some or all of that evidence admissible.

¶ 72   But the State never had the opportunity to shoulder that burden to establish attenuation as to some or all of the evidence that resulted from the search. The matter never got that far, as the trial court agreed with the State that defendant's wife gave voluntary consent to the police entry.

¶ 73   The State should be given that opportunity. Thus, despite our holding that the warrantless entry was not justified by voluntary consent and thus constituted a *per se* unreasonable search, the proper course is not to order suppression of that evidence but to give the State the opportunity to argue attenuation. See *In re K.M.*, 2019 IL App (1st) 172322, ¶¶ 50-53; *People v. Ollie*, 333 Ill. App. 3d 971, 993-94 (2002); *People v. Wallace*, 299 Ill. App. 3d 9, 21 (1998).

¶ 74                                      CONCLUSION

¶ 75   We thus vacate defendant's conviction and remand this cause for an attenuation hearing, with the following directions. If the court determines that *all* evidence that defendant seeks to suppress was attenuated from the taint of the warrantless entry and is thus admissible, then the court is directed to reinstate its judgment of conviction. See *Ollie*, 333 Ill. App. 3d at 993-94; *Wallace*, 299 Ill. App. 3d at 21.

¶ 76   If, on the other hand, the court determines that *some* of the evidence was attenuated from the warrantless entry and some was not, the court should determine (1) whether sufficient admissible evidence remained to support defendant's conviction and, if so, (2) whether the admission of that nonattenuated, inadmissible evidence deprived defendant of a fair trial. The trial court would then proceed accordingly from those findings.

¶ 77   If the court determines that *none* of the evidence was attenuated from the warrantless entry, and thus all of it should be suppressed, the court should enter a judgment of acquittal, as this evidence consisted of the entirety of the State's proof at trial. See *People v. Williams*, 2020 IL App (1st) 172992, ¶ 12 (when all of State's evidence at trial is later determined to be subject to suppression, proper remedy is outright reversal of conviction).

¶ 78   In so directing, we have reviewed the evidence (potentially subject to suppression though it may be) and determined that it was sufficient to support defendant's conviction, and thus double jeopardy is no bar to a possible retrial. See *People v. Lopez*, 229 Ill. 2d 322, 367 (2008) (in determining sufficiency of evidence for double-jeopardy purposes of retrial, reviewing court may consider inadmissible as well as admissible evidence at original trial).

¶ 79   Defendant's conviction is vacated. This cause is remanded for an attenuation hearing in accordance with the directions given above.

¶ 80   Vacated and remanded with directions.